FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2012 OCT 23 P 1: 02

CLERK'S OFFICE
AT BALTIMORE

BY_____ _____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOSEPH ROBERTS #367291,
    Plaintiff                    :

    v.                           :   CIVIL ACTION NO. JKB-12-1187

OFFICER KYLE TANIGUCHI[1]    :
    Defendant

## MEMORANDUM

On April 17, 2012, Joseph Roberts ("plaintiff") filed a civil rights action seeking money damages and the firing of Officer Taniguchi[2] ("defendant"), an employee of the Cecil County Detention Center. Roberts alleged that as a result of Taniguchi's failure to secure any of the cells on his tier or make the rounds, Roberts was attacked by fellow detainees during the early morning hours of April 10, 2012. ECF Nos. 1 and 17 at 3. Defendant, through counsel, has filed a motion to dismiss or for summary judgment (ECF No. 9) which is opposed.[3] ECF No. 17. A hearing is not necessary to resolve the pending dispositive motion. *See* Local Rule 105.6 (D. Md. 2011).

### Background

On April 3, 2012, Roberts was taken to the Cecil County Detention Center ("CCDC") pending disposition of an assault charge.[4] ECF No. 9, Exhibit 1. On April 11, 2012, Roberts wrote a

---

[1] The Clerk shall amend the docket to reflect the full and proper spelling of defendant's name.

[2] Roberts sues Taniguchi in both his official and individual capacities. ECF No. 4.

[3] Plaintiff seeks leave to amend the complaint to add Deputy Raymond Maurer, who was assigned to the lower D tier the evening of the incident, as a defendant. ECF No. 14. For reasons apparent herein, Maurer would not be liable for damages based on the record. Plaintiff's motion for leave to amend shall be denied.

[4] A parole retake warrant related to three charges of indecent exposure had previously been issued by the Maryland Parole Commission on March 22, 2012. A bench warrant for violation of probation had issued from the Circuit Court for Cecil County related to the same charges on March 30, 2012. *Id.*, Exhibits 3-4.

letter, received by the Office of Sheriff on April 16, 2012, stating that he had been assaulted by two other inmates in his cell on April 10, 2012. Roberts requested that the matter be investigated, and claimed CCDC "never let [him] file an incident report with your office." *Id.*, Exhibit 5. The matter was assigned for investigation to Detective William Sewell on April 16, 2012. The investigation revealed that Roberts allegedly was assaulted approximately ten minutes before he was moved from his tier. Roberts indicated that after the assault, he banged on the tier window to attract the attention of Correctional Officer Taniguchi, who entered the day room and escorted Roberts and another inmate from the tier. *Id.*, Exhibit 6. Roberts told the investigator that as he was being taken from the tier, he told Taniguchi what had happened. Taniguchi allegedly responded that because no other housing units were available, he would have to take Roberts to "psych housing" with the other inmate. Roberts claimed that only he and the Deputy were present during this conversation. Roberts was unable to identity either of his alleged attackers and could offer no reason as to why he was attacked. He had expressed no safety concerns and did not have problems with any of the other detainees.[5] *Id.*

Taniguchi, who was interviewed on May 17, indicated he had completed an In House Report concerning the alleged assault on Roberts on April 10, 2012. *Id.*, Exhibits 6-7. Taniguchi, one of fifteen officers on duty that shift, reported to work at 11:00 p.m. on April 9, 2012, and was scheduled to work until 7:00 a.m. the next day. *Id.*, Exhibit 8. Taniguchi was normally assigned to Unit A, Tier B, which was closed for renovation; thus, he was temporarily assigned as the inmate escort officer. *Id.*, Exhibit 8. At approximately 2:18 a.m., while walking from the Medical Unit, Taniguchi heard banging coming from the window of Lower D tier. He looked at the window and saw Roberts motioning to him to come to the tier. Taniguchi entered the tier and was

---

[5] When interviewed by Detective Terry Ressin, none of the 14 other inmates assigned to Lower D tier (where the alleged assault occurred) had any knowledge of the assault. *Id.* Exhibit 6.

first approached by inmate Michael Wild ("Wild"), who stated that he was thinking about hurting himself.[6] *Id.*, Exhibit 8. Taniguchi told Wild to gather his belongings, intending to escort Wild from the tier and take him to booking, where suicidal inmates are housed. At the same time Taniguchi was dealing with Wild, Roberts said that he also was going to hurt himself and wanted off the tier. Roberts appeared very agitated and was breathing heavily, but told Taniguchi "nothing" was going on. Taniguchi told Roberts to gather his belongings as he intended to take him from the tier to the booking area, where both Roberts and Wild would be placed on suicide watch. *Id.*, Exhibit 8.

Taniguchi suspected something was wrong, but Roberts did not tell him that he had been assaulted. Although Taniguchi did not observe any visible injuries on Roberts in the day room, he noticed several small cuts and abrasions on Roberts' forehead while escorting him to booking. Not believing Roberts' earlier denial that anything was wrong, Taniguchi again asked if anything had happened, and Roberts again said "nothing," but that he wanted to hurt himself. Roberts said he had no idea of how he had scraped his head because he had been sleeping. Taniguchi asked Roberts if he needed to go to the Medical Unit, but Roberts said no. When Taniguchi asked Roberts if he had been assaulted, Roberts denied it. Taniguchi escorted both inmates to booking where they replaced their clothing with paper gowns because of the threats of suicide. They were placed in cell 120 and given suicide blankets. Taniguchi then notified his supervisor, Corporal Sybil Woods ("Woods") of what had taken place. *Id.*, Exhibit 8.

Deputy Raymond Maurer ("Maurer") was also interviewed as part of Sewell's investigation and stated that he had been assigned to Unit D, Tier E tier at the time of the alleged assault. He recalled Taniguchi approaching him as he was returning from the Medical Unit and

---

[6] It is unclear whether the institution had a policy of keeping cells unlocked so that detainees could use the day room at all times. From the information presented, it appears Wild, Roberts, and others were out of their cells and in the day room during the time relevant to this case.

stating that Roberts was banging on the tier window. As a result, both deputies entered the tier to determine what was going on. Maurer positioned himself near the door and Taniguchi actually entered the day room and spoke with both Wild and Roberts. Maurer confirmed the conversation described by Taniguchi and stated he, too, never heard Roberts say anything about an assault and observed no injuries on Roberts' person. *Id.*, Exhibit 6.

When interviewed, Woods, who was working in booking at the time, recalled that after he had been housed in booking, Roberts asked to go to the Medical Unit because of a bleeding cut on his head. Woods did not observe any cut or blood, but saw a "bump." *Id.*, Exhibit 6. Roberts was taken to the Medical Unit, and signed in at the Medical Unit at 3:25 a.m., where he was seen ten minutes later. *Id.*, Exhibits 9 and 10. Inmate Request form records note that Roberts had an "abrasion on forehead" but did not complain of pain. He indicated he had an "altercation in the tier." His abrasions were cleansed with saline solution and a routine medical check was within normal limits. *Id.*, Exhibits 10 and 11. Roberts was discontinued from suicide watch on April 10. He made a further medical complaint on April 11, and was taken to Union Hospital, where testing was negative. He also made a medical complaint on April 13. *Id.*, Exhibits 12-14. As to the April 13 request, Roberts stated in the Inmate Request form that he had been attacked by "some inmates," and, as a result, had injuries to his head and right ear. Roberts was examined and Motrin was prescribed. *Id.*, Exhibit 13. Roberts was transferred to the Division of Correction on April 19, 2012. *Id.*, Exhibit 14.

Investigator Sewell concluded that Roberts had been assaulted by one or more inmates, based in part on the fact that the security camera had been covered (presumably by an inmate throwing something over it) at the time of the alleged assault. However, with no ability to identify who had engaged in the act, Sewell recommended on April 16, 2012, that the criminal investigation

be suspended and no charges were brought. Detective Ressin reviewed the investigation and approved it on May 30, 2012. *Id.,* Exhibit 6.

## Standard of Review

As noted, defendant has moved to dismiss or, in the alternative, for summary judgment. " 'The purpose of a Rule 12(b) (6) motion [to dismiss] is to test the sufficiency of a complaint.' " *McBurney v. Cuccinelli,* 616 F.3d 393, 408 (4th Cir.2010) (citation omitted). A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must " 'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light most favorable to the plaintiff.' " *Brockington v. Boykins,* 637 F.3d 503, 505–06 (4th Cir.2011) (citation omitted).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways,* 510 F.3d 442, 450 (4th Cir. 2007). However, Rule 12(d) permits a court, in its discretion, to consider matters outside of the pleadings on a motion under Rule 12(b)(6). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *See Finley Lines Joint Protective Board. Unit 200 v. Norfolk Southern Corporation,* 109 F.3d 993, 997 (4th Cir.1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

This court deems it appropriate to consider the extraneous materials, as they are likely to

5

facilitate disposition of this case.[7] Accordingly, defendant's motion shall be treated as a motion for summary judgment.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of material fact". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), cert. denied, 541 U.S. 1042 (2004). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In resolving the motion, this court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 378 (2007);

---

[7] A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed.2004, 2011 Supp.). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* at 149. In general, courts are guided in this determination by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.* at 165–67.

*Dennis v. Columbia Colleton Medical Center, Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). Additionally, because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Nonetheless, the court must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corporation v. Catrett*, 477 U.S. 317, 323–24, (1986)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

**Analysis**

The constitutional protections afforded a pretrial detainee as provided by the Fourteenth Amendment are co-extensive with those provided to convicted prisoners by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992), citing *Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988); *see also Riley v. Dorton*, 115 F. 3d 1159, 1167 (4th Cir. 1997) (pre-trial detainee's Fourteenth Amendment right with respect to excessive force is similar to prisoner's Eighth Amendment right). The inquiry with respect to conditions of confinement is whether those conditions amount to punishment of the pretrial detainee, as due process proscribes punishment of a detainee before proper adjudication of guilt. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

Not every inconvenience that is encountered during pre-trial detention amounts to "punishment" in the constitutional sense. *Martin,* 849 F.2d at 870. A particular restriction or condition of confinement amounts to unconstitutional punishment in violation of the Fourteenth Amendment if it is imposed with the express intent to punish or it is not reasonably related to a legitimate, non-punitive goal. *Bell,* 441 U.S. at 538–39 (restrictions or conditions that are arbitrary or purposeless may be considered punishment). In determining whether the challenged conditions amount to punishment, it is not the province of this court to determine how a particular prison might be more beneficently operated; the expertise of prison officials must be given due deference. *See Sandin v. Conner,* 515 U.S. 472, 482 (1995).

Only conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). In order to establish the imposition of cruel and unusual punishment, plaintiff must prove two elements - that he suffered deprivation of a basic human need that was *"objectively* sufficiently serious," and that *"subjectively* [defendants] acted with a sufficiently culpable state of mind." *Shakka v. Smith,* 71 F.3d 162, 166 (4th Cir. 1995) (citation omitted). To withstand summary judgment on a challenge to prison conditions, plaintiff must produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions. *See Strickler v. Waters,* 989 F.2d 1375, 1381 (4th Cir. 1993). Similarly, in order to prevail on a claim of failure to protect from violence, plaintiff must establish that defendant exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto,* 816 F.2d 977, 979 (4th Cir. 1987).

Plaintiff alleges that defendant deliberately exposed him to assault by failing to lock his and others' cell doors. He further implies that defendant (and possibly other staff members)

8

negligently failed to make the rounds, which would have revealed the camera was blocked with an article of clothing. Had defendant and others taken these steps, Roberts implies the assault would not have taken place. Defendant does not suggest that Taniguchi or any personnel at CCDC knew or had reason to know that he was targeted for assault, or that he was unduly vulnerable or at a known risk for harm by his fellow detainees. Furthermore, Roberts was removed from contact with his assailant(s) within minutes, and his relatively minor injuries were promptly treated, including assessment and care at an area hospital.

Roberts has failed to establish a claim of constitutional magnitude. At most, he states a claim of negligence. As the underlying constitutional claims are not established, the court also declines to exercise supplemental jurisdiction to address any state tort claims of negligence that may be raised in the complaint.

Defendant is entitled to summary judgment. A separate Order granting same and closing this case shall be entered in accordance with this Memorandum.

DATED this 22 day of October, 2012.

BY THE COURT:

_____
James K. Bredar
United States District Judge